**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DELAWARE COUNTY SAFE** | : | **CIVIL ACTION** |
| **DRINKING WATER COALITION, INC.,** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **KATHLEEN MCGINTY, Secretary of the** | : | |
| **Pennsylvania Department of Environmental** | : | **NO.  07-1782** |
| **Protection, et al.,_____** | : | |
| | : | |
| **Defendants.** | : | |

**MEMORANDUM AND ORDER**

GENE E.K. PRATTER, J.                                              JULY 27, 2007

Plaintiff Delaware County Safe Drinking Water Coalition, Inc. (the "Coalition") has sued

the Administrator of the Environmental Protection Agency ("EPA"), the Secretary of the

Pennsylvania Department of Environmental Protection ("PaDEP"), and Gary D. and Barbara

Creighton, seeking an injunction to prevent the PaDEP from issuing a National Pollutant

Discharge Elimination System ("NPDES") permit to the Creightons, and to suspend the

Commonwealth NPDES permitting program as a whole.  The Coalition also seeks an injunction

against the EPA to compel enforcement of its duties arising under the Clean Water Act of 1972,

33 U.S.C. § 1251, et seq. ("CWA").

Presently before the Court is the Motion to Dismiss for lack of subject matter jurisdiction

pursuant to Rules 12(b)(1) and 12(b)(2) of the Federal Rules of Civil Procedure filed by the

PaDEP, and the Motion to Dismiss pursuant to Federal Rule "12(b)" filed by the Creightons.[1]

Also pending before the Court is the Coalition's Application for a Preliminary Injunction to

enjoin the PaDEP and the Creightons from taking any action relating to the Creightons' NPDES

Permit Application during the pendency of this lawsuit.[2]

For the reasons set forth below, the Court will dismiss the claims against both the PaDEP

and the Creightons.  As a result, the Application for a Preliminary Injunction is moot.

## I.      FACTUAL BACKGROUND

The Coalition is a Pennsylvania not-for-profit corporation comprised of members who are

resident in Delaware County, Pennsylvania, and dependent upon the local Crum and Ridley

Creeks water supply systems.  The Coalition is fairly characterized as a public interest group

troubled by what it contends to be nearly 20 years of construction-related water pollution.

According to the Coalition, this pollution has impaired the Crum Creek, and now threatens to do

further damage to the remaining local waterbodies.

The Creightons are owners of a 37.65 acre plot of forested hillside and meadow-land in

Delaware County.  According to the Coalition, the plot drains through a running tributary directly

into the wetlands adjacent to the Ridley Creek.  On January 28, 2003, the Creightons applied to

the Upper Providence Township Council for subdivision and land development review of their

plans to construct 51 new, single-family homes on 52 subdivided lots.  On May 8, 2003, the

---

[1]The Court interprets this motion to seek dismissal pursuant to Rules 12(b)(1) and 12(b)(6).

[2]The Court does not address in this Memorandum the Motion to Dismiss Counts III and IV filed by the EPA (Docket No. 20).  This Motion, and these Counts, will be addressed separately, at a later date.

Council conducted a conditional use hearing and approved the conditional use permits and the preliminary subdivision plan.  Thereafter, on October 23, 2003, the Council approved the final subdivision plan subject to certain conditions.[3]  One such condition is the approval by the PaDEP of the Creightons' Permit Application No. PA I012303009, for an NPDES permit.

The Creightons' Permit Application is currently pending before the PaDEP.  However, the Coalition seeks an injunction against the PaDEP to prevent the issuance of an NPDES permit to the Creightons, as well as a declaration that the PaDEP violated the CWA, and the Administrative Procedures Act, 5 U.S.C. § 701 et seq. ("APA"), in its ongoing consideration of the Application.  Specifically, the Coalition claims that the PaDEP violated the federal statutes in the following ways: (1) by its refusal, for over three years, to request an "economic and social justification" for the Creightons' proposed direct encroachment upon the water courses and tributaries to High Quality Ridley Creek under Pennsylvania antidegradation regulation, 40 C.F.R. § 131.32(a)(2); and (2) by its "abuse" of the "exceptional discretionary powers given to it by the U.S. E.P.A." to regulate the construction industry, outside the mandatory requirements of the CWA, by its failure to refuse to issue an NPDES permit to the Creightons, despite the opposition of environmental organizations, and the advice of three experts, that the proposed activity encompassed within the Permit Application threatens harm to the Ridley Creek in the vicinity of its collecting pond.

_____

[3]The predecessor to the Coalition, an unincorporated association bearing the same name and constituted of similar membership, began its fight against the Creightons' development after the Council approved the final subdivision plan.  Their appeal to the Pennsylvania Commonwealth Court to overturn the decision of the Council was quashed.  Middletown Twp. Land Conservancy, Inc. v.  Upper Providence Twp. Council, No. 1579 C.D. 2004 (Pa. Commw. Ct. Mar. 9, 2005).

In addition to the Coalition's claims germane to the Creightons' Permit Application, the Coalition asserts that the Pennsylvania NPDES program, as a whole, operates in violation of the CWA, APA, and 42 U.S.C. § 1983. The Coalition seeks a temporary injunction suspending all permitting activities relating to the Delaware County waters until PaDEP complies the provisions of the CWA.

Specifically, the Coalition claims that the PaDEP is in violation of the effluent standards and limitations required by the CWA inasmuch as it allegedly has failed to protect the waters of Springton Reservoir for their use as a public water supply, and for fishing and recreation, by issuing permits in respect of the construction industry that violate "a narrative, and minimum threshold standard" for a state regulatory system, under 33 U.S.C. §§ 1312(a) and § 1313(c)(2)(A). The Coalition claims that PaDEP is in violation of an order of the EPA by its refusal to consider a citizen Petition to designate the waters of Ridley Creek, emergent from Ridley Creek State Park, and above the "Media Water Works," as "National Resource Waters," deserving of the highest levels of protection, and its failure to list the waters of Springton Lakes, and their outfall, as impaired, in the required listing of Water Quality Limited Segments pursuant to 40 C.F.R. §§ 130.7(d), 130.10(d)(6).

The Coalition alleges PaDEP abused its discretion, presumably under the APA, by (1) refusing to enforce a standard requiring the "best practicable control technology currently available" under 33 U.S.C. § 1314(b) and 40 C.F.R. § 122.44(s)(2) with respect to construction activities in proximity to a public water supply, which would limit impervious surfaces to 10% of the affected area, and (2) unreasonably waiting to require the Creightons to apply for a Section 404 Permit until the receipt of a U.S. Army Corps of Engineers jurisdictional letter.

Finally, the Coalition alleges the PaDEP has violated the Fourteenth Amendment rights of the Coalition's membership by refusing to terminate permits, and refusing to decline to issue new permits, where the permitted activity endangers human health or the environment, under 40 C.F.R. § 122.64(a)(3), is an encroachment in the proximity of a public water supply in-take, under 40 C.F.R. § 232.3(c)(6)(xi), and constitutes a "taking" as formulated in the Supreme Court's opinion in Illinois Central Railroad Co. v. Illinois, 146 U.S. 387 (1892).

The Coalition also charges the Creightons with violations of the CWA for having failed to conform their Permit Application to the requirements of the applicable antidegradation regulation, 40 C.F.R. § 131.32, and with § 1983 violations predicated on the same conduct.

The PaDEP has filed a motion to dismiss under Rule 12(b)(1) on the grounds that the Coalition does not possess Article III standing, and that its claims are not ripe for adjudication. The PaDEP alternatively argues that the Coalition has failed to assert claims that are within the jurisdictional grant of the CWA, and has failed to assert a cognizable Constitutional right, or deprivation of such a right.  Additionally, the PaDEP submits that it is immune to suit pursuant to the Eleventh Amendment of the United States Constitution.

The Creightons similarly move to dismiss the claims levied against them on the grounds of ripeness and standing.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(1) provides that a party may bring a motion to dismiss for lack of subject matter jurisdiction.  Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977).  "A motion to dismiss for want of standing is also properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter."  Ballentine v. U.S., 2006

WL 3298270, at *1 (D.V.I. Sept. 21, 2006) (citing St. Thomas-St. John Hotel & Tourism Ass'n v. Gov't of the U.S. Virgin Islands, 218 F.3d 232, 240 (3d Cir. 2000); Kauffman v. Dreyfus Fund, Inc., 434 F.2d 727, 733 (3d Cir. 1970)).

Pursuant to Rule 12(b)(1), the Court must accept as true all material allegations set forth in the complaint, and must construe those facts in favor of the nonmoving party.  See Warth v. Seldin, 422 U.S. 490, 501 (1975). Where a federal court's jurisdiction is at issue, a court may look beyond the pleadings to satisfy itself as to the existence, or nonexistence, of jurisdiction. Mortensen, 549 F.2d at 891.  Where the court finds that it lacks jurisdiction over the subject matter of a claim, it must be dismissed.  Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994).

With respect to a dismissal for failure to state a claim pursuant to Rule 12(b)(6), the burden is on the party moving for a dismissal.  Thus, the court must again accept as true all well-pleaded allegations in the complaint, and view them in the light most favorable to the plaintiff.  Angelastro v. Prudential-Bache Sec., Inc., 764 F.2d 939, 944 (3d Cir. 1985).  A 12(b)(6) motion will only be granted when it is certain, under any set of facts that could be proved by the plaintiff, that no relief could be granted.  Ransom v. Marrazzo, 848 F.2d 398, 401 (3d Cir. 1988).

## III.    STATUTORY SCHEME - THE CLEAN WATER ACT

At its core, this dispute raises questions regarding the division of the duties and enforcement powers among the EPA, and the states, and the jurisdiction of the Court to intervene and provide a remedy to such questions.  Given that in some significant respects the Coalition's Amended Complaint lacks clarity, it is necessary to bring the Coalition's claims into sharper

-6-

focus by providing the framework upon which these claims purportedly rest.

Congress enacted the basic regulatory structure now evident in the CWA as part of the Federal Water Pollution Control Amendments of 1972.  33 U.S.C. § 1251, et seq.  The Act was adopted to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a); see Arkansas v. Oklahoma, 503 U.S. 91, 101 (1992).

Prior to 1972, Congress attempted to address water pollution by focusing its regulatory efforts on achieving "water quality standards."  Natural Res. Def. Council v. EPA, 915 F.2d 1314, 1316 (9th Cir. 1990) (citing EPA v. State Water Res. Control Bd., 426 U.S. 200, 202-03 (1976)).  These standards were set by the individual states and established the "tolerable" degree of pollution of intrastate waters.  Id.  However, the water-quality-centric model was criticized as lacking  preventative capability.  Id.  There are two primary reasons why this was so, namely, because it allegedly ignored individual discharges of pollutants until a lake or stream surpassed the acceptable standards, and, because  "working backwards" from the waterbody to find and address the cause of the pollution proved impracticable.  Id.

To address these concerns, Congress adopted a new regulatory structure which focused on the individual dischargers of pollutants.  The CWA places limitations on the amount of pollutants that individual entities can discharge through technology-based controls, and their related effluent limitations.  Thus, unlike water quality standards, which are based on the physical attributes of a particular water segment, technology-based limitations are based on an evaluation of the capability of pollution control technologies.  Westvaco Corp. v. EPA,  899 F.2d 1383, 1384 (4th Cir. 1990).  With a goal of zero discharge, the CWA's technology controls have evolved, so that, by 1987, potential polluters were required to use the "best available technology"

to limit the discharge of pollutants.  Natural Res. Def. Council, 915 F.2d at 1316 (citing 33

U.S.C. §§ 1311(b)(2)(A), 1342).

The primary mechanism for the imposition of technology-based limits on pollution is the

National Pollution Discharge Elimination System.  33 U.S.C. § 1342.  The CWA requires that

before a "point source"[4] may discharge any pollutants into waters of the United States, the source

must obtain an NPDES permit.  33 U.S.C. §§ 1311, 1342.  NPDES permits contain effluent

limitations on the amount of pollution that a source may discharge into receiving waters based on

the technological capabilities of the source.  33 U.S.C. §§ 1311(b)(1-3).  Thus, an NPDES permit

allows its holder to discharge pollutants at levels below thresholds incorporated in the permit.  33

U.S.C. § 1342(a); 40 C.F.R. § 122.1 et seq.

The CWA provides that NPDES permits are to be issued by the EPA, unless the EPA has

authorized a state agency to administer its own NPDES program.  33 U.S.C. § 1342.  When a

state applies to the EPA to administer its own program, the Administrator "shall approve each

submitted program" unless he determines that the state agency does not have adequate authority

to ensure compliance with each of nine program requirements set forth in the Act.  33 U.S.C. §§

1342(b)(1)-(9).  In 1978, the EPA approved Pennsylvania's NPDES program, and in 2000, the

EPA approved an extension of the program to stormwater discharges.

State-approved NPDES programs are subject to continued EPA oversight.  The state

NPDES program must comply at all times with the requirements of § 1342(b) and with the

federal guidelines promulgated pursuant to § 1314(i)(2) for monitoring, reporting and

---

[4]A "point source" is "any discernable, confined and discrete conveyance from which
pollutants are or may be discharged."  33 U.S.C. § 1362(14).

enforcement of the NPDES.  33 U.S.C. §§ 1342(b), (c)(2).  The Act includes provisions for the EPA to withdraw its approval of a state program.  Thus, if the Administrator determines, after public hearing, that a state program has fallen out of compliance, "he shall so notify the State and, if appropriate corrective action is not taken within a reasonable time, not to exceed ninety days, [he] shall withdraw approval of such program."  33 U.S.C. § 1342(c)(3).

Notwithstanding Congress' shift of focus from the recipient water body to the discharging entities, Congress included water quality-based controls within the CWA as a supplemental limit on pollution, "so that numerous point sources, despite individual compliance with effluent limitations, may be further regulated to prevent water quality from falling below acceptable levels."  The Raymond Proffitt Found. v. EPA, 930 F. Supp. 1088, 1090 (E.D. Pa. 1996) (citing PUD No. 1of Jefferson County v. Wash. Dep't of Ecology, 511 U.S. 700, ___, 114 S. Ct. 1900, 1905 (1994)); 33 U.S.C. § 1313(b)(1)(C).  See also  Fla. Pub. Interest Research Group Citizen Lobby, Inc. v. EPA., 386 F.3d 1070, 1074 (11th Cir. 2004) ("Water quality standards play an important role in maintaining and improving the cleanliness and safety of the nation's waterbodies, because they are designed to determine which waterbodies are safe enough to support their designated uses.").

Under the current regulatory scheme, the first step to achieving water-quality based controls is the adoption of water quality standards for intrastate waters, by each state.  33 U.S.C. § 1313(c).  Generally, water quality standards define the water quality goals of a particular body of water "by setting forth the uses to be made of the water and the criteria necessary to protect those uses."  Proffitt, 930 F. Supp. at 1090 (citing 40 C.F.R. §§ 130.3, 131.2).  EPA regulations provide that state water quality standards must include three fundamental elements: (1) use

designations; (2) water quality criteria sufficient to protect the designated uses; and (3) an

acceptable antidegradation policy.  40 C.F.R. § 131.6.

States may designate the uses of their own waters within established constraints.  An

example of such a constraint is that designated uses must be at least as protective of water quality

as existing uses.  40 C.F.R. § 130.10.  The states may also develop the criteria, expressed

quantitatively as a constituent concentration, or in a narrative statement, for acceptable levels of

pollution, in light of the designated use of a body of water.  See 40 C.F.R. § 131.11.  Finally, the

state must submit an antidegradation policy, subject to EPA approval, which provides full

protection of the existing uses of waters, and high quality waters constituting an outstanding

national resource, and other levels of protection for waters where quality exceeds the level

needed to protect existing uses.[5]  See 40 C.F.R. § 131.12.

---

[5]Pennsylvania's antidegradation policy is codified at 40 C.F.R. § 131.32.  It is not the
product of the state's own devise.  Instead, the EPA promulgated this policy as a result of its
disapproval of Pennsylvania's proposed policy.  Proffitt, 930 F. Supp. at 1105.
The policy is as follows:

>(a) Antidegradation policy. This antidegradation policy shall be applicable
>to all waters of the United States within the Commonwealth of
>Pennsylvania, including wetlands.
>>(1) Existing in-stream uses and the level of water quality necessary
>>to protect the existing uses shall be maintained and protected.
>>(2) Where the quality of the waters exceeds levels necessary to
>>support propagation of fish, shellfish, and wildlife and recreation in
>>and on the water, that quality shall be maintained and protected
>>unless the Commonwealth finds, after full satisfaction of the
>>inter-governmental coordination and public participation
>>provisions of the Commonwealth's continuing planning process,
>>that allowing lower water quality is necessary to accommodate
>>important economic or social development in the area in which the
>>waters are located. In allowing such degradation or lower water
>>quality, the Commonwealth shall assure water quality adequate to
>>protect existing uses fully. Further, the Commonwealth shall assure

Step two in the process of the development of water quality controls is that each state must compile a list of waterbodies that are not safe enough to support their designated uses, i.e., that do not meet their water quality standards. 33 U.S.C. § 1313(d)(1)(A). This list is known as a state's "impaired waters list" or "303(d) list" (so called because section 303(d) of the CWA, 33 U.S.C. § 1313(d), requires the creation of the list). Each waterbody on the impaired waters list is deemed a "water quality limited segment" ("WQLS"). 40 C.F.R. § 130.2(j). The placement of a waterbody on a state's impaired waters list is significant because the CWA requires that states target WQLSs for pollution control. Sierra Club, Inc. v. Leavitt, 488 F.3d 904, 907-08 (11th Cir. 2007).

The final step is for the states to undertake the task of decreasing pollution in their WQLSs by establishing a "total maximum daily load" ("TMDL") for pollutants in a designated WQLS. 33 U.S.C. § 1313(d)(1)(C); 40 C.F.R. § 130.7(c)(1). A TMDL defines the maximum amount of a pollutant that a body of water can receive from all point and nonpoint sources each day before a violation of the state water quality standards will occur. 33 U.S.C. § 1313(d)(1)(C). States must establish a TMDL for every pollutant that prevents, or is expected to prevent, a waterbody from attaining applicable water quality standards. 40 C.F.R. § 130.7(c)(1)(ii). Once a

---

that there shall be achieved the highest statutory and regulatory requirements for all new and existing point sources and all cost-effective and reasonable best management practices for nonpoint sources.
(3) Where high quality waters are identified as constituting an outstanding National resource, such as waters of National and State parks and wildlife refuges and water of exceptional recreational and ecological significance, that water quality shall be maintained and protected.

40 C.F.R. § 131.32 (1996).

TMDL is established, the state (as well as the federal government) strives to decrease the amount of the pollutant to which that TMDL applies so that the TMDL is not exceeded.  The CWA also requires states to "establish a priority ranking [for WQLSs needing TMDL development], taking into account the severity of the pollution and the uses to be made of such waters."  Sierra Club, 488 F.3d at 908 (quoting 33 U.S.C. § 1313(d)(1)(A)); see also 40 C.F.R. § 130.7(b)(4).

States are required to submit their lists of WQLSs, TMDLs, and priority rankings to the EPA every two years.  40 C.F.R. § 130.7(d)(1).  The EPA has the duty of approving or disapproving these biennial lists.  33 U.S.C. § 1313(d)(2); 40 C.F.R. § 130.7(d)(2).  If the EPA disapproves a state's impaired waters list or a TMDL, the EPA must assume the duty to issue such a list or TMDL.  33 U.S.C. § 1313(d)(2); 40 C.F.R. § 130.7(d)(2).  Sierra Club, 488 F.3d at 908.

Having established supplementary water quality based controls to limit pollution, by virtue of § 1311(b)(1)(C), Congress implemented the controls through a requirement that NPDES permits include "any more stringent limitation, including those necessary to meet water quality standards, treatment standards, or schedules of compliance, established pursuant to any State law or regulations (under authority preserved by section 1370 of this title) or any other Federal law or regulation, or required to implement any applicable water quality standard established pursuant to this chapter."  33 U.S.C. § 1311(b)(1)(C).  See Am. Paper Inst., Inc. v. EPA, 996 F.2d 346, 349-50 (D.C. App. 1993) ("the water quality standards by themselves have no effect on pollution; the rubber hits the road when the state-created standards are used as the basis for specific effluent limitations in NPDES permits").  NPDES permit writers must also incorporate revised effluent limitations into an NPDES permit based on TMDLs.

Finally, there is one further mechanism for reduction of point source pollution in regard to water quality.  In addition to the implementation of water quality based controls through a mandate that states include these "more stringent limitations" within NPDES permits, § 1312 provides the EPA with limited, supplemental authority to directly impose these more stringent limitations when necessary to prevent the violation of water quality standards.[6]  See Michael P. Healy, Still Dirty After Twenty-Five Years: Water Quality Standard Enforcement and the Availability of Citizen Suits, 24 Ecology Law Quarterly, 393, 413 (1997) ("Section 302 is not intended to undercut or in any way affect the development of water quality standards under section 303 nor the imposition of section 301 (b)(1)(C) of the Act.  Rather, it is a supplemental provision which directs the Administrator, with the concurrence of the State, to impose effluent limitations which assure the attainment or maintenance of water quality . . . ." (quoting S. Rep. No. 99-50, at 24 (1986))).

The CWA provides for private enforcement of its provisions through the availability of a

_____

[6]Section 1312 provides as follows:

> (a) Establishment
> Whenever, in the judgment of the Administrator or as identified under section 1314(l) of this title, discharges of pollutants from a point source or group of point sources, with the application of effluent limitations required under section 1311(b)(2) of this title, would interfere with the attainment or maintenance of that water quality in a specific portion of the navigable waters which shall assure protection of public health, public water supplies, agricultural and industrial uses, and the protection and propagation of a balanced population of shellfish, fish and wildlife, and allow recreational activities in and on the water, effluent limitations (including alternative effluent control strategies) for such point source or sources shall be established which can reasonably be expected to contribute to the attainment or maintenance of such water quality.

33 U.S.C. § 1312.

"citizen suit."  The contours of this private right of action are discussed below in the context of the Coalition's claims.

IV.    **CITIZEN-SUIT AGAINST THE PADEP UNDER THE CLEAN WATER ACT**[7]

The Coalition asserts that the Commonwealth's NPDES program is a "defective" and "illegal" regulatory system as a whole, and that the PaDEP has committed specific violations of the CWA with respect to the Creightons' Permit Application.

The Amended Complaint describes, without great detail, a history of allegedly illegal permitting by the PaDEP that has purportedly resulted in the impairment of Crum Creek and the Springton Reservoir.  In an effort to protect the Ridley Creek from a similar fate, the Coalition seeks relief against the PaDEP from its ongoing violation of the "minimum threshold requirements" for a state regulatory system under the CWA "by lax and unlawful permitting standards" and by failing to protect "the in-stream uses of the regulated waters for public water supply, fishing and recreation."  (Am. Compl. ¶ 27.)  The Coalition seeks a temporary injunction suspending the issuance of all "permits that propose impact upon the Ridley Creek water supply system" until the Pennsylvania NPDES program becomes compliant with the CWA, as well as a permanent injunction prohibiting any attempt by the Creightons to obtain an NPDES permit. (Am. Compl. ¶D. (19).)

Both the PaDEP and the Creightons argue that the Coalition lacks standing under Article III of the Constitution to seek injunctive relief pursuant to the CWA, because the Coalition has failed to allege that its members have sustained or faced the threat of any "injury in fact."

---

[7]These claims are set forth, and incorporated by reference within, Count II of the Coalition's Amended Complaint.

-14-

Only "citizens" may invoke the enforcement provisions of the CWA.  Section 1365(g) of the Act defines a "citizen" as "a person or persons having an interest which is or may be adversely affected."  33 U.S.C. § 1365(g).  Congress has indicated that this provision confers standing to enforce the CWA to the full extent allowed by Article III of the Constitution.  See Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n, 453 U.S. 1, 16 (1981) (citing S. Conf. Rep. No. 92-1236, at 146 (1972), which notes that the term "citizen" in the CWA reflects the Supreme Court's decision in Sierra Club v. Morton, 405 U.S. 727 (1972)); Three Rivers Ctr. for Ind. Living v. Housing Auth. of City of Pittsburgh, 382 F.3d 412, 420 (3d Cir. 2004) (citing Laidlaw, 528 U.S. 167)).

An association has Article III standing to bring suit on behalf of its members "when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  Laidlaw, 528 U.S. at 181.  A fair reading of the Amended Complaint suggests that the Coalition advances claims germane to the purpose for which it was incorporated, that is, "to represent its membership interest in a safe, clean and reliable water supply in Delaware County, Pennsylvania."  (Art. of Incorp., Ex. 9A to Pl.'s Resp. ¶ 3.)  Though the Defendants do not contend that the Coalition's individual members are required to participate in the lawsuit, PaDEP contests whether the Coalition can show that its individual members would have standing to sue in their own right.

To establish Article III standing, individual members of an organization must show:  (1) an  injury in fact; (2) a causal link between the defendant's conduct and the injury, such that the conduct is "fairly traceable" to the injury; and (3) the likelihood that judicial relief will redress

the injury.  Am. Littoral Soc. v. EPA Region, 199 F. Supp. 2d 217, 230-31 (D.N.J. 2002) (citing

Laidlaw, 528 U.S. at 180-81; Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992); Pub.

Interest Research Group of N.J., Inc. v. Magnesium Elektron, Inc., 123 F.3d 111, 119 (3d Cir.

1997)).

The Supreme Court has held that "environmental plaintiffs adequately allege injury in

fact when they aver that they use the affected area and are persons 'for whom the aesthetics and

recreational values of the area will be lessened' by the challenged activity."  Laidlaw, 528 U.S. at

183 (quoting Sierra Club, 405 U.S. at 735).  In the Amended Complaint, the Coalition alleges

that "all or a majority of [its] current membership . . . are residents of Delaware County,

Pennsylvania, and a majority live or have lived in close proximity to the Ridley Creek, and in the

vicinity of the Crum Creek valley, where, in prior years, many enjoyed the shore-line fishing, the

aesthetic beauties and recreational activities, as well as the purity of the drinking water within

these two proximate, and now commonly owned, water supply systems."  (Am. Compl. ¶ 15B.)

Moreover, the type of harm here alleged  –  that is, the pollution and the reasonable

likelihood of continued pollution of waterbodies that the Coalition members use, and whose

integrity the CWA is intended to protect[8]  –  is a type of harm that the courts have recognized as

_____

[8]Specifically, the Coalition claims to have suffered the following harm resulting from
PaDEP's unlawful NPDES program:

> the discharge of household and road surface pollutants, from point source
> seepage beds, on-site septic systems and impervious surfaces into the
> waters of Crum Creek from deforestation and development activities
> permitted by the PaDEP over a period of twenty or more years, now
> procures a marked discoloration, eutrophication, odoriferous turbidity,
> visual degradation and periodic catastrophic drying of the formerly
> protected and pristine Springton Reservoir in Delaware County, thereby
> adversely affecting the recreational, environmental, aesthetic and health,

an "injury in fact."  Fla. Pub. Interest Research Group Citizen Lobby, Inc. v. EPA, 3386 F.3d

1070, 1085 (11th Cir. 2004) (citations omitted).[9]

 However, the PaDEP has aptly noted that the Coalition failed in its initial pleading to

identify with specificity any of its members who have suffered this harm.  In response to this

facial attack upon the sufficiency of the Coalition's allegation of Constitutional standing, the

Coalition has submitted evidence in the form of its Articles of Incorporation, and the names and

residences of its incorporators listed therein, whom the Coalition identifies to be "lifetime

homeowners living in the Ridley Creek valley and tied to its water system."  (Pl.'s Resp. 28.)

 Under Pennsylvania law, the Coalition's incorporators are "the initial members of the

corporation."  15 Pa. C.S. § 2102(b).  Though evidence of the nature submitted by the Coalition

may not survive a challenge to the standing of the Coalition's individual members at a later stage

in this litigation,[10] "the truth of jurisdictional allegations need not always be determined with

finality at the threshold of litigation."  Natural Res. Def. Council, 1998 WL 372299, at *8

---

safety and property interests . . . of the membership . . . .

(Am. Compl. ¶ IV.C.)

 [9] Neither the Creightons nor the PaDEP address the "fairly traceable" or the "redressability" prongs of the standing inquiry.  Because, as discussed below, the Coalition has not presented a valid claim under the citizen-suit provision of the CWA, for the purposes of this inquiry, the Court will assume, without deciding, that the purported injury of the continued pollution of the Delaware County waterbodies may be said to be fairly traceable to the PaDEP's decision to exclude certain waters from its impaired waters list and that the injury could be redressed through injunctive relief.

 [10]For the purposes of the present motions, the Court here infers that the Coalition's incorporators remain members of the Coalition some ten months after fulfilling their initial duty to organize the corporation.

(<u>citing</u> Moore's Federal Practice, § 12.30[1]).  For the purposes of the present jurisdictional

motions, at this pleading stage, general factual allegations of injury resulting from a defendant's

conduct suffice, due to the presumption that general allegations embrace those specific facts that

are necessary to support the claim.  <u>Lujan</u>, 504 U.S. at 561.  <u>See also</u> <u>Bldg. and Const. Trades</u>

<u>Council of Buffalo, N.Y. and Vicinity v. Downtown Dev., Inc.</u>, 448 F.3d 148, 145 (2d Cir. 2006)

(finding no authority that supports the proposition that an association must "name names" in a

complaint in order to adequately allege injury in fact to its members).

 Having found that the Coalition may invoke the enforcement provisions of the CWA as a

"citizen" within the meaning of the Act, the Court must next consider whether the jurisdictional

grant of the citizen-suit provision of the CWA extends to the Coalition's claims in this case.

 By virtue of § 1365(a)(1) of the citizen-suit provision, Congress authorized the district

courts to hear private enforcement suits against any person alleged to be "in violation" of an

"effluent standard or limitation,"[11] or of an "order" issued by the EPA Administrator with respect

---

 [11]In general, an effluent limitation dictates "in specific and technical terms the amount of
each pollutant that a point source may emit" and it "describe[s] the *measures* needed to
implement the criteria defined in the water quality standards."  <u>Am. Paper Inst., Inc. v. EPA</u>, 890
F.2d 869, 876 (7th Cir. 1989) (citations omitted).
 For the purposes of the citizen-suit provision of the CWA, § 1365(f) defines an "effluent
standard or limitation" to include:

> (1) effective July 1, 1973, an unlawful act under subsection (a) of section 1311 of
> this title; (2) an effluent limitation or other limitation under section 1311 or 1312
> of this title; (3) standard of performance under section 1316 of this title; (4)
> prohibition, effluent standard or pretreatment standards under section 1317 of this
> title; (5) certification under section 1341 of this title; (6) a permit or condition
> thereof issued under section 1342 of this title, which is in effect under this chapter
> (including a requirement applicable by reason of section 1323 of this title); or (7)
> a regulation under section 1345(d) of this title.

33 U.S.C. § 1365(f).

to such a standard or limitation.  The citizen-suit provision states, in relevant part:

> (a) Authorization; jurisdiction
> Except as provided in subsection (b) of this section and section 1319(g)(6)
> of this Title, any citizen may commence a civil action on his own behalf–
>> (1) against any person (including (i) the United States, and (ii) any
>> other governmental instrumentality or agency to the extent
>> permitted by the eleventh amendment to the Constitution) who is
>> alleged to be in violation of (A) an effluent standard or limitation
>> under this chapter or (B) an order issued by the Administrator or a
>> State with respect to such a standard or limitation, or
>> (2) against the Administrator where there is alleged a failure of the
>> Administrator to perform any act or duty under this chapter which
>> is not discretionary with the Administrator.[12]

33 U.S.C. § 1365(a).  The Act authorizes injunctive relief to abate violations.[13]  Id.

Because the CWA "intertwines the jurisdiction of the district court with the grounds for

relief in a citizen enforcement action," Save Our Cmty. v. EPA, 971 F.2d 1155, 1162 (5th Cir.

1992) (citing Sierra Club v. Shell Oil Co., 817 F.2d 1169, 1173 (5th Cir. 1987), cert. denied, 484

U.S. 985 (1987)), if a person charged is not "in violation" of the CWA, the plaintiff does not

have statutory standing under the Act.  Atlantic States Legal Found., Inc. v. Stroh Die Casting

Co., 116 F.3d 814, 825 (7th Cir. 1997). [14]  It is clear that the Coalition has not charged the PaDEP

---

[12]The "Administrator" is defined as the Administrator of the EPA.  33 U.S.C. § 1251(d).

[13]The purpose of the citizen-suit provision of the CWA is to permit citizens to abate pollution when the government cannot or will not command compliance.  Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc., 484 U.S. 49, 59-62 (1987).

[14]For the purposes of this discussion, the Court assumes, without deciding, that the Secretary of the PaDEP is not immune from suit under the Eleventh Amendment to the United States Constitution.  The Court may retain jurisdiction over a suit against a state official in her official capacity to prevent a continuing violation of federal law.  The Ex Parte Young doctrine applies, when, as is the case here, a party seeks only prospective equitable relief from the violation.  See Natural Res. Def. Counsel v. Cal. Dep't of Transp., 96 F.3d 420, 423-24 (9th Cir. 1996) (concluding that the Eleventh Amendment did not bar citizen-suit against the director of the California Department of Transportation for violation of the conditions of its permit to

with actions that amount to "violations" within the meaning of the CWA.

The Coalition's broad allegations regarding the "laxity" of the PaDEP NPDES program make cursory reference to the "standards" set forth in §§ 1312(a) and 1313(c)(2)(A).  (Am. Compl. ¶ I.1.A.(i)).  As discussed above, § 1313(c)(2)(A) sets forth the guidelines for adoption by the states of water quality standards, and § 1312 permits the EPA to supplement state-issued NPDES permits with water quality related effluent limitations.  Thus, it appears that the Coalition claims that the PaDEP is directly in violation of an "effluent standard or limitation" under § 1365(a)(1) through its ongoing issuance of permits, and consideration of permit applications, without regard to the quality or status of the waters of Delaware County. Alternatively, if not in direct violation of the effluent standards or limitations of the Act, the Coalition proceeds under the theory that the PaDEP is the "causal agent" of the ongoing violations of persons discharging pollutants under the authority of existing, defective permits, and will be the cause of the discharges of the Creightons, who may in the future obtain a defective NPDES permit.

The Coalition avers that the PaDEP is in violation of an "order" of the EPA in failing to designate the waters of Ridley Creek as National Resource Waters, and failing to request an economic or social justification, pursuant to 40 C.F.R. 131.32(b), for the Creightons' proposed construction activities which will impact the high quality waters of Ridley Creek.  The Coalition also alleges that the PaDEP is in violation of an "order" of the EPA inasmuch as it has failed to list the Springton Lakes, and their outfall, as "impaired" waterbodies in the Commonwealth's biennial list pursuant to 40 C.F.R. § 130.7, and within its list of Water Quality Limited Segments

discharge stormwater from its maintenance yards).

-20-

pursuant to 40 C.F.R. § 130.10.  (Am. Compl. ¶ I.1.A.(ii)((B).)

Whether or not the identified provisions of the CWA constitute "effluent standards or limitations," or "orders" under the citizen-suit provision, the Coalition misconstrues the purpose of § 1365(a)(1) of the Act.  A state agency is not "in violation" of the CWA by its failure to enforce or implement an effluent standard or limitation, or an order of the EPA, but only where it is itself a polluter.

In O'Leary v. Moyer's Landfill, 523 F. Supp. 642, 648 (E.D. Pa. 1981), the court determined that the "ordinary sense of the 'in violation' phrase in section 1365(a)(1) connotes defendants who are themselves the instrumentality discharging the pollution; the jurisdictional grant does not in terms create responsibility on the part of a regulatory agency charged with the enforcement of standards even where the agency decides against enforcement."

Following O'Leary, and after an extensive analysis of the statute, the court reached a similar conclusion in Ringbolt Farms Homeowners Assoc. v. Town of Hull, 714 F. Supp. 1246, 1252-53 (D. Mass. 1989).[15]  There, the court considered the legislative history of the CWA, and its complex web of enforcement and remedial provisions, and concluded, that unlike the Administrator of the EPA under § 1365(a)(2), state agencies may not be compelled under § 1365(a)(1) to a assume duty of enforcement or a duty to implement the provisions of the Act. Id. at 1252.  Further, the Ringbolt court recognized the type of relief sought by the Coalition, that is, a suspension of the PaDEP's permitting authority, is available solely via § 1342 of the CWA -

---

[15]In Ringbolt, 714 F. Supp. at 1253, the NPDES permit program was administered by the EPA rather than the Massachusetts state agency.  Nevertheless, in considering the grant of jurisdiction to sue a state agency for enforcement of the CWA, the court made the assumption that Massachusetts had authority to administer its own NPDES program.  Id.

a provision that confers authority upon the EPA, and not the district court, to withdraw permitting authority from a particular state, if its program is not in compliance with the Act.[16]  Id. at 1253.

Other courts, including our court of appeals, have concurred in this interpretation of the statute.  See, e.g., Allegheny County Sanitary Auth. v. EPA, 732 F.2d 1167, 1174 (3d Cir. 1984) ("[t]he [CWA] authorizes 'citizen suits' against the federal administrator and polluters . . . but . . . not against the state defendants named here . . ."); Love v. N.Y. State Dep't of Envt'l Conservation, 529 F. Supp. 832, 839-41 (S.D.N.Y. 1981).  See also Rodgers, 2 Environmental Law § 4.5 ("The EPA Administrator and state agencies are not 'in violation' of effluent limitations by simply failing to enforce water quality standards, or prior consent orders, or to take other enforcement action.") (citations omitted).

Inasmuch as the Coalition has not alleged that the PaDEP is in and of itself discharging pollutants, the Coalition cannot pursue its purported claim against the PaDEP for a violation of the CWA, and the Court may not assert subject matter in this instance.

## V.    CITIZEN-SUIT AGAINST THE CREIGHTONS UNDER THE CLEAN WATER ACT

In Count VI, the Coalition claims that the Creightons are in violation of the CWA by failing to conform their Permit Application, for an unreasonable period of time, to the requirements of Pennsylvania's antidegradation regulation, 40 C.F.R. § 132.31.  Specifically, the

---

[16]O'Leary and Ringbolt may be viewed as specifically rejecting the "causal agent" theory advanced by the Coalition.  In both of these cases, the court found that the state agencies were not responsible for the harm flowing from the discharge of pollutants by non-state permit holders, even where the state failed to enforce its own consent orders limiting, or otherwise prohibiting, the ongoing discharges of pollutants by these permit-holding entities.  See O'Leary, 523 F. Supp. at 648; Ringbolt, 714 F. Supp. at 1251-57.

Coalition takes issue with the alleged failure of the Creightons to provide an economic and social justification for their "proposed degradation of designated High Quality Waters." (Am. Compl., Count VI, ¶38.) Elsewhere in the Amended Complaint, the Coalition characterizes the Creightons' pursuit of an NPDES permit to be in violation of the CWA as an "unreasonable perpetuation of a threat."

The CWA does not confer jurisdiction upon district courts to oversee the pending administrative details of a permit application process, or to interject itself into the NPDES process in substitute of a state agency. Thus, the claims must fail because they are not ripe for adjudication.

The Coalition challenges agency action, which is ripe for review if it imposes an obligation, denies a right, or fixes some legal relationship as a consummation of the administrative process. The Supreme Court has found that the purpose of the ripeness doctrine is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Ohio Forestry Ass'n Inc. v. Sierra Club, 523 U.S. 726, 732-33 (1998) (quoting Abbott Laboratories v. Gardner, 387 U.S. 136, 148-49 (1967), overruled on other grounds, Califano v. Sanders, 430 U.S. 99 (1977)). Consequently, in determining whether a disagreement is abstract or whether a dispute *requires* judicial intervention, "the court should examine whether the issues are fit for judicial resolution and whether withholding judicial resolution will result in hardship to the parties." New Hanover Twp. v. U.S. Army Corps of Engineers, 992 F.2d 470, 472 (3d Cir. 1993) (emphasis added).

Typically, as was the case in <u>New Hanover Township</u>, questions of ripeness arise after an administrative agency has acted, but prior to the agency taking final action or issuing a formalized administrative decision.  Here, the Coalition seeks the intervention of this Court prior to allowing *any* action on the part of the PaDEP.  Thus, the Coalition seeks preemptive relief from the presumed harm that will supposedly flow to its membership should the PaDEP grant an NPDES permit to the Creightons.

There are no factors indicating that the Creightons' Permit Application is fit for judicial resolution.  The only material suggestion that the PaDEP has taken a "final" position on the permit comes from a letter addressed to the PaDEP from Attorney Talbot, a Coalition member and its counsel, indicating that he (Mr. Talbot) received the "advises" of Dominic Rocco, P.E., and James Newbold, P.E., of the Watershed Management Section of the PaDEP, that the Creightons' Application met PaDEP standards and would imminently issue.  (Ex. 1 to Pl.'s Resp.)  However, on April 11, 2007, Mr. Newbold responded to Mr. Talbot that he (Mr. Talbot) was "incorrect in [his] characterization of [his] conversations with [Messrs. Rocco and Newbold] and in [his] characterization of the status of the Creighton permit applications."  (Ex. 2 to Pl.'s Resp.)  Mr. Newbold proceeded to inform the Coalition that "no final determination has been made on the applications and review of the applications is continuing."[17]  <u>Id.</u>

Of course, these letter communications do not constitute final agency action, and absent any determination by the PaDEP as to the Creightons' Permit Application, there is no impact

---

[17]The Coalition also argues that this dispute is ripe simply because the PaDEP has taken too long to issue a decision on the permit.  However, the Coalition does not assert a claim against the Creightons for unreasonable delay, and in this context, the length of the state administrative process has no bearing on whether the issues are fit for adjudication in this forum.

upon the Coalition.  There is no ongoing violation by the Creightons of any provision of the

CWA, nor is there currently any concrete harm stemming from their "unreasonable perpetuation

of a threat."  The only harms described in the Amended Complaint pertaining directly to the

Creightons will not be concrete unless and until the PaDEP issues an NPDES permit.  The

Creightons cannot begin construction or development activities until they obtain the permit;

should they do so in the absence of a permit, it is apparent that this type of unpermitted activity,

if causing the discharge of a pollutant, would create a ripe dispute, redressable under CWA §§

1311(a) and 1365(a).

There are no grounds for this Court to "needlessly interpose[] an extra layer of

administrative proceedings in this matter" when, in fact, the PaDEP may render a decision

satisfactory to the Coalition.  See New Hanover Twp., 992 F.2d at 473.  Moreover, the Coalition

will not be deprived of a forum in which to assert its rights arising under federal law or the

Constitution.  The Coalition will have the opportunity to challenge the validity of the permit

before the Pennsylvania Environmental Hearing Board, and if necessary, eventually in the

Commonwealth courts.  See Ringbolt, 714 F. Supp. at 1256-57 (citing U.S. v. Marathon Dev.

Corp., 867 F.2d 96, 102 (1st Cir. 1989) ("stating that any defect in the state's more stringent

water quality certification program is properly redressed in state court rather than federal court");

Love, 529 F. Supp. at 840 ("[t]o contest the state's issuance of [a discharge permit under

federally approved state program], plaintiff's remedy is in [a] . . . proceeding in the state

court")).[18]

---

[18]Specifically, if, and when, the PaDEP issues an NPDES permit to the Creightons, this
"agency action" is subject to review under the Environmental Hearing Board Act, 25 Pa. C.S. §§
7511-7516.  The Environmental Hearing Board ("Board") has the authority to reverse or

## VI.   SECTION 1983 CLAIMS AGAINST THE PADEP AND THE CREIGHTONS

The Coalition also advances claims pursuant to the Civil Rights Act, 42 U.S.C. § 1983,

against both the PaDEP and the Creightons.[19]  These claims, described in paragraphs I.(B)(iii)

and in Counts I and V of the Amended Complaint, endeavor to articulate an alleged deprivation

by the PaDEP and the Creightons of the Coalition members' right to life, liberty and property

under the Fourteenth Amendment.

The Coalition may not pursue its claims against the Creightons under § 1983.  To employ

§ 1983 as a remedy for deprivation of a federally secured right, a plaintiff must generally show

that the alleged deprivation was committed by a person acting under color of state law.  Stated

differently, purely private conduct is not within the reach of the statute.  See, e.g., Edmonson v.

Leesville Concrete Co., Inc., 500 U.S. 614, 619 (1991).

---

condition any PaDEP action, and provides the opportunity to interested third parties to intervene
in any matter pending before the Board.  35 Pa. C.S. §§ 7514(c), (e).  The Board has the authority
to grant a supersedeas of a permit prior to adjudication, or a temporary supersedeas pending
hearing and ruling on a supersedeas petition.  35 Pa. C.S. § 7514(d)(3).  The Board's rulings are
subject to review by the Commonwealth Court of Pennsylvania, 42 Pa. C.S. § 763(a)(1), and the
Board has the authority to hear and rule upon federal Constitutional claims, and claims relating to
violations of the Pennsylvania antidegradation regulations.  See, e.g., Middle Creek Bible
Conference, Inc. v. Dep't of Envt'l Resources, 645 A.2d 295 (Pa. Commw. Ct. 1994); Blue
Mountain Preservation Assoc., Inc. v. Commonwealth of Pa. Dep't of Envt'l Protection, 2006
WL 2679895, at *1,a EHB Docket No. 2005-077-K (Sept. 7, 2006).

[19]Section 1983 provides that:

> Every person who, under color of any statute, ordinance, regulation, custom or
> usage, of any State . . . , subjects, or causes to be subjected, any citizen of the
> United States or other person within the jurisdiction thereof to the deprivation of
> any rights, privileges, or immunities secured by the Constitution and laws, shall be
> liable to the party injured in an action at law, suit in equity, or other proper
> proceeding for redress.

42 U.S.C. § 1983.

Although even a private individual may be regarded as acting under color of state law under proper circumstances, the Court must inquire as to whether the act of the individual or entity may be fairly attributed to the state, or whether the actor was a person for whom the state may fairly be held responsible.  See, e.g, Sotack v. Pa. Property and Cas. Ins. Guar. Ass'n, 104 F. Supp. 2d 471, 477 (E.D. Pa. 2000) (explaining various tests to determine whether private entity is a state actor) (citations omitted).  In this case there is no allegation that the Creightons have exercised powers or performed functions which are normally executed by the state.  See id.  The Coalition has not alleged that the Creightons' conduct has been coerced or significantly encouraged by the state, or that a sufficiently close nexus exists between the challenged action and the state to explain that the action should be regarded as that of the state.  See id.  There are no allegations, nor does it seem to be the case, that the mere application by the Creightons for an NPDES permit has caused the Creightons to step into the shoes of a state actor.

Additionally, the Coalition has failed to state a viable claim against the PaDEP under § 1983.  In Sea Clammers, 453 U.S. at 13, the Supreme Court addressed in detail the provisions of the CWA, noting that they included "unusually elaborate enforcement provisions, conferring authority to sue for this purpose both in government officials and private citizens."  453 U.S. at 13.  Because of the extent of the remedial provisions, the Court was "compelled to conclude that Congress provided precisely the remedies it considered appropriate," in the CWA,  id. at 15, and that "private remedies in addition to those expressly provided should not be implied."  Id. at 18.  Thus, a cause of action under § 1983 is barred by the scheme of redress provided by the CWA.

The Coalition directly bases at least some of the PaDEP's alleged violations of § 1983 upon the CWA.  The Amended Complaint as written offers no other reasonable explanation

given that the Coalition seeks injunctive relief against the Secretary of the PaDEP for:

> the repeated issuance and threat of future issuance of permits . . . that . . . violate the constitutionally protected civil rights of citizens, including the Plaintiffs' membership (to life, liberty and property under the 14th Amendment to the U.S. Constitution and [§ 1983] in a historically safe, healthy, reliable, long term, and un-degraded public water supply; specifically in that the Secretary has refused to enforce the Constitutionally mandated minimums that require[] permit termination (or refusal) when "the permitted activity endangers human health or the environment" [40 C.F.R. § 122.64(a)(3)], where a proposed water course encroachment stands "in the proximity of a public water supply in-take" [40 C.F.R. § 232.3(c)(6)(xi)] . . . .

(Am. Compl. ¶ I.A.(iii).)  Because the CWA contains a comprehensive enforcement scheme, these claims as stated are not available under § 1983.  See Allegheny County, 732 F.2d at 1175-76 (3d Cir. 1984) (dismissing claims brought under § 1983 due to the comprehensiveness of the CWA though the citizen-suit provision did not afford plaintiffs a remedy in that instance).[20]

The remainder of the Coalition's § 1983 claim does not directly reference the statutory

---

[20]The Coalition additionally incorporates by reference in Count I the allegations in paragraph I.(D) of the Amended Complaint.  Within the referenced paragraph, the Coalition asserts that the PaDEP has "abused its exceptional discretionary powers" by:

> [r]efusing to enforce a commonplace, rational and historic standard, seen always in the past, and elsewhere in the United States, of wide separation . . . between human occupancy . . . and the public water supply systems, reservoirs, collecting ponds, and their direct tributaries, but recommending instead (in its B.M.P. Manual, Chap. 5, p. 18), a ludicrous minimum separation of 100 feet between building and waters's edge, and then applying this failed standard to the community reservoirs of Delaware County . . . thus causing, over time, a serious degradation of the waters.

(Am. Compl. § I.A.(iv)(D).)  Inasmuch as the Coalition later clarifies that the "B.M.P. Manual" refers to the "best management practices" regulatory system authorized under §§ 1314(f) and 1329(b) of the CWA, (Am. Compl. ¶ 9 at 24), it is clear that these allegations are predicated upon the rights established by and within the CWA.

-28-

provisions of the CWA, or the regulations promulgated thereunder, but rather relates to an alleged violation of Constitutional rights arising under the Fourteenth Amendment.  Section 1983 claims predicated on independent Constitutional violations are not necessarily precluded under the rule in Sea Clammers, 453 U.S. at 14-16.  See, e.g., Swartz v. Beach, 229 F. Supp. 2d 1239, 1258 (D. Wyo. 2002) (citing Southwest Air Ambulance, Inc. v. City of Las Cruces, 268 F.3d 1162, 1176 (10th Cir. 2001)).  However, it is clear to the Court that the Coalition's claims do not achieve this independence.

The Coalition asserts that it has a Constitutional right to a "safe, healthy, reliable, long term, and un-degraded water supply." (Am. Compl. ¶ I.A.(iii)).  A reasonable interpretation of this statement in the context of this case is that the Coalition seeks to protect its right to be free from environmental pollution.  This is not a recognized Constitutional right.  Nat'l Sea Clammers Ass'n v. City of N.Y., 616 F.2d 1222, 1237-38 (3d Cir. 1980), vacated on other grounds, 453 U.S. at 22.

What is left in the pleading is little more than the Coalition's citation to the Supreme Court's venerable case of  Illinois Cent. Railroad Co. v. Illinois, 146 U.S. 387 (1892), which, according to the Coalition, "invalidate[s] every attempt by the state or a state agency to convert public property in water to a private use."  (Pl.'s Resp. 31.)  Inasmuch as the Coalition has failed to reveal the contours of its claim, and chooses to rely on a cursory citation and conclusory statement, the Court will attempt to divine the application of Illinois Central to this case.

In  Illinois Central, the Supreme Court announced the "public trust doctrine."  In 1869, the Illinois legislature granted the railroad, in fee simple, title to over 1,000 acres of submerged land extending into Lake Michigan about one mile from a portion of Chicago's shoreline and had

authorized the railroad to operate a rail line over the property.  Illinois Central, 146 U.S. at 444.

After the railroad improved the property and commenced operations, the state legislature

repealed the enabling legislation and revoked the original grant.  Id. at 449.  The Supreme Court

rejected the railroad's challenge to the state action, holding that a state may not abdicate its

obligation to preserve its navigable waters for the use of the public.  Id. at 453.  The Court found

that "[t]he trust devolving upon the State for the public, and which can only be discharged by the

management and control of property in which the public has an interest, cannot be relinquished

by a transfer of the property."  Id.

    More recently, in a California state case, again cited without application by the Coalition,

the court found that "the core of the public trust doctrine is the state's authority as sovereign to

exercise a continuous supervision and control over the navigable waters of the state and the lands

underlying those waters."  Nat'l Audubon Soc'y v. Superior Court, 658 P.2d 709, 33 Cal.3d 419,

425 (Cal. 1983).  Several principles flow from this concept, and are aptly summarized in Lake

Michigan Fed'n v. U.S. Army Corps of Eng'rs, 742 F. Supp. 441, 445 (N.D. Ill. 1990): "First,

courts should be critical of attempts by the state to surrender valuable public resources to a

private entity . . . Second, the public trust is violated when the primary purpose of a legislative

grant is to benefit a private interest . . . Finally, any attempt by the state to relinquish its power

over a public resource should be invalidated under the doctrine."  (citations omitted).

    As far as is possible to determine, it seems that the Coalition contends that by and

through the PaDEP's "unlawful permitting activities," (Count I, ¶ 25), the PaDEP has somehow

relinquished its supervisory authority, and effected a legislative grant, or a conveyance, of lands

held in public trust, to private parties.[21]  Without proceeding to further analyze what constitutes

the type of surrender anticipated by the public trust doctrine, it becomes clear at this point that

the independence of this Constitutional violation is itself surrendered.  The alleged constitutional

violation is predicated upon the PaDEP's alleged shortcomings in administering the

Commonwealth antidegradation regulations, in failing to submit lists of impaired and extremely

high value waters to the EPA, and in improperly allowing for development in close proximity to

waters' edge, all presumptive violations of the CWA.  For this reason, the rule first stated in Sea

Clammers precludes the Coalition's § 1983 claims under the "public trust doctrine" against the

PaDEP.[22]

## VII.   CLAIMS AGAINST THE PADEP UNDER THE APA

In Count II, ¶ 29, and in paragraphs I.A.(iv)(A)-(D) of the Amended Complaint, the

Coalition asserts a variety of claims against the PaDEP under the APA.  Under § 706(2)(A) of

the APA, the Court may set aside . . . agency action . . found to be . . . arbitrary and capricious, an

abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  However,

an "agency" is defined under the act to be an authority of the Government of the United States.  5

U.S.C. § 701 (b)(1).  The Coalition admits as much in its Response, and concedes that the

PaDEP is not a federal authority.  Therefore, the Court will dismiss the claims against the PaDEP

under the APA.

---

[21]The Court does not reach the question of whether the Ridley, Crum and Springton waterbodies are held in public trust by the Commonwealth.

[22] Additionally, given the arguments in the Amended Complaint itself, it is counterintuitive that the Commonwealth has surrendered its supervisory role of its state waters. The NPDES program quite clearly establishes, rather than reneges, an administrative role for the Commonwealth.

**VIII.  CONCLUSION**

For the reasons set forth herein, the Court lacks subject matter jurisdiction over the claims asserted by the Coalition against the Creightons and the PaDEP and will dismiss Counts I, II, V and VI pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

BY THE COURT:

 S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DELAWARE COUNTY SAFE** | : | **CIVIL ACTION** |
| **DRINKING WATER COALITION, INC.,** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **KATHLEEN MCGINTY, Secretary of the** | : | |
| **Pennsylvania Department of Environmental** | : | **NO.  07-1782** |
| **Protection, et al.,_____** | : | |
| | : | |
| **Defendants.** | : | |

## ORDER

**AND NOW**, this 27th day of July 2007, **IT IS HEREBY ORDERED** that:

(1)    The Motion to Dismiss filed by the Secretary of the Pennsylvania Department of Environmental Protection for lack of subject matter jurisdiction (Docket No. 18) is **GRANTED**, and **Counts I** and **II** are dismissed in their entirety;

(2)    The Amended Motion to Dismiss filed by Gary D. and Barbara Creighton (Docket No. 19) is **GRANTED**, and **Counts V** and **VI** are dismissed in their entirety;

(3)    Plaintiff's Application for a Preliminary Injunction to suspend any and all permitting activities of the Pennsylvania Department of Environmental Protection with regard to Permit Application N.P.D.E.S. PA I012303009 is **MOOT** inasmuch as the Court may not assert subject matter jurisdiction over the claims asserted by Plaintiff against this Defendant.

Should either the Creightons or the PaDEP wish to intervene in this action at a later date, they may submit a motion requesting such intervention to the Court at that time.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE